UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                         :

| | | |
|---|---|---|
| ENEMIGO LTD., | : | Case No. |
| | : | |
| Plaintiff, | : | |
| | : | **COMPLAINT** |
| -against- | : | |
| | : | |
| TRINITY BEVERAGE GROUP, LLC | : | **DEMAND FOR JURY TRIAL** |
| MICHAEL BELL, HILL FLYNN, JURETA | : | |
| CAPITAL PARTNERS LLC, VERITY WINES, | : | |
| LLC, ORACLES CAPITAL, INC. | : | |
| | : | |
| Defendants. | : | |
| | : | |

-------------------------------------------------------------x

       Plaintiff Enemigo Ltd. ("Enemigo" or "Plaintiff") alleges for its complaint against Defendants, to the best of its knowledge, information and belief, formed after an inquiry reasonable under the circumstances:

<u>**NATURE OF THE ACTION**</u>

       1.     Enemigo is a London-based Tequila company that has been selling two ultra-premium products.  Named one of the most celebrated tequilas in the world, Enemigo has had critical acclaim since it has launched in 2017 and been awarded multiple awards, including Double Golds, Platinum Awards, and tequila of the year awards. Enemigo works with some of the most well-known retailers, bars and restaurants in the markets it operates in.

       2.     As part of their expansion efforts, in 2020, defendants Michael Bell ("Bell") and Hill Flynn ("Flynn") convinced Enemigo to invest $500,000 into defendant Jureta Capital Partners LLC ("Jureta"), a company wholly-owned by Flynn and Bell.  On the same day of its investment, Enemigo signed an exclusive distribution agreement with defendant Verity Wines, LLC ("Verity"), an affiliate company owned by Jureta who, in turn, was owned by Flynn and Bell.

3.      Shortly after entering into the distribution agreement, Verity fell behind on its payments to its suppliers and accumulated a substantial amount of debt.  At that point, Defendants came up with their first fraudulent scheme: create a new corporate structure while leaving Jureta and Verity with unserviceable debt, thereby destroying Jureta's value and Enemigo's $500,000 investment.

4.      Under the new corporate structure, Defendants created defendant Trinity Beverage Group, LLC ("Trinity") who entered into a second supplier agreement with Enemigo a few months later.

5.      From the start of the Enemigo-Trinity partnership, things did not go well.  Although Enemigo fulfilled all of its obligations by investing a considerable amount of time and money into Trinity after losing its $500,000 investment in Jureta, and regularly supplied Trinity with its awarding-winning tequila, Trinity's marketing and distribution efforts were demonstrably subpar and not as promised and Trinity was consistently late on payments it owed to Enemigo for its tequila.  After falling considerably behind on its contractual and payment obligations, Trinity and its principals concocted another fraudulent scheme to target and induce Enemigo to invest additional monies into Trinity via the purchase of shares and enter into an exclusive supplier agreement with Trinity.

6.      In 2021, Trinity's principals told Enemigo that it had formalized a national master distribution deal with the country's largest wine a spirit distributor, Southern Glazer's Wine and Spirits, LLC ("SGWS"), and that Enemigo would directly benefit from the SGWS deal with product line priority and national exposure.  All Enemigo had to do was sign a new exclusive supplier distribution agreement with Trinity and pay it $250,000 for an equity stake in Trinity based on the valuable SGWS deal Trinity claimed to have with SGWS.

7.      As it turns out, Trinity never entered into a master distribution deal with SGWS. After months of demanding a copy of the SGWS contract, Trinity's principals scrambled and fabricated an agreement, forged the signature of SGWS's chief sales and marketing officer, and presented the fraudulent document to Enemigo.  This document was used by Defendants to fraudulently induce Enemigo into entering into the exclusive Enemigo-Trinity supplier agreement and paying $250,000 to Trinity.

8.      As a result of Defendants' fraudulent acts, Enemigo has suffered damages in the millions of dollars based on lost sales and profits and monies invested into Jureta and Trinity.

## PARTIES

9.      Plaintiff Enemigo is an English limited company with its principal place of business in London, England.

10.      Defendant Trinity is a Delaware limited liability company with its principal place of business in New York.  Trinity's member is defendant Oracles Capital Inc. ("Oracles"), a Delaware corporation with its principal place of business in Florida.

11.      Defendant Bell is an individual and New York resident.  Bell is the current CEO of Trinity.

12.      Defendant Flynn is an individual residing in the State of New York.  Flynn was the former CEO of Trinity.

13.      Defendant Jureta is a Delaware limited liability company with its principal place of business in New York.  Jureta's members are Flynn and Bell who are both New York residents.

14.      Defendant Verity is a New York limited liability company with its principal place of business in New York.  Upon information and belief, Verity's members are Flynn and Bell who are both New York residents.

15.     Defendants JOHN and JANE DOEs #1 through #99 are persons and entities, the names of which are presently unknown to Enemigo, who participated in the wrongful conduct alleged in this Complaint.

## JURISDICTION AND VENUE

16.     Jurisdiction is proper pursuant to 28 U.S.C. § 1332(a) as this matter is between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

17.     Jurisdiction is also proper under 28 U.S.C. § 2201 because this case seeks, *inter alia*, a declaratory judgment to adjudicate the rights of the parties hereto.

18.     This Court has personal jurisdiction over Defendants because they are subject to a forum selection clause and/or are located and transact business in New York concerning acts, transactions and circumstances relating to the claims alleged herein.

19.     Venue is proper under 28 U.S.C. §1391(a) because one or more Defendants are subject to personal jurisdiction in this District and/or a substantial part of the events or omissions that give rise to the claims occurred or property that is the subject of the action is situated in this District.

## STATEMENT OF FACTS

### A.  Enemigo Invests $500,000 in Jureta and Enters into the Initial Supplier Agreement with Verity

20.     In 2020, Enemigo was approached by Flynn and Bell to invest into Jureta, an investment company purportedly focused on wine and spirits distribution and import acquisitions.

21.     Following due diligence and negotiations, on July 24, 2020, Enemigo invested $500,000 in Jureta through the issuance of a convertible note dated July 24, 2020 (the "Jureta Note").  On the same day, Enemigo entered into an exclusive supplier agreement with Verity, a

wholly-owned subsidiary of Jureta, for the importation and distribution of Enemigo's tequila in the United States (the "Verity Supplier Agreement").

22.     Enemigo proceeded to supply Trinity with its tequila, and Trinity paid for the product, albeit through many late payments.  As it turns out, late payments were the least of Jureta and Verity's problems.

**B. Within Just a Few Months of Taking $500,000 from Enemigo, Defendants Intentionally Destroy Jureta's Value by Leaving It with Unserviceable Debt, thereby Eviscerating Enemigo's Investment**

23.     Upon information and belief, at the same time Verity was making its late payments to Enemigo, Verity was purchasing wine and spirits from other suppliers but failed to pay for the products.  Instead, Verity defaulted on its obligations only to have some of the products Verity purchased end up in the hands of a new "independent" corporate group under the moniker "Trinity."   In reality, Trinity was just another corporate vehicle Defendants created to abscond with Enemigo's money and avoid having to pay their debt obligations.

24.     Specifically, within just a few months of Enemigo's $500,000 investment into Jureta, Bell secretly formed Trinity with the help of Gordon Lewis of Altman & Company, LLC, a company who claims to specialize in "financial management serving debtor and creditor needs."

25.     The sole member of Trinity is Oracles, another acquisition vehicle owned by Bell. Oracles claims to be a "wine and spirits brand development and control oriented investment company."  Upon information and belief, Verity was subsequently merged into and/or acquired by Trinity in connection with a sham Article 9 judicial foreclosure that is the subject of another lawsuit in this District, *Hobbs v. Verity Wines LLC, et al.*, Case No. 1:21-cv-10597 (JPC).  Defendants Flynn, Bell, Verity and Trinity are parties to the *Hobbs* lawsuit.  Defendants have been accused of

committing fraud and engaging in RICO violations, among other things, as further discussed below.

### C. The Verity Supplier Agreement Generates Weak Sales; Trinity Sells Enemigo on a Purported Master Distribution Deal It has with Southern Glazer's Wine and Spirits that will Help Grow Enemigo's Business

26.     In or about June 2021, Enemigo advised Trinity that it owed $123,205 in outstanding payables under the Verity Supplier Agreement.

27.     In lieu of paying the outstanding balance owed by Verity, Flynn and Bell proposed that Enemigo forgive the $123,205 in outstanding payables under the Verity Supplier Agreement and invest an additional $126,795 in the new Trinity group through the issuance of a convertible note and enter into a new supplier agreement based on a purported master distribution agreement that Trinity alleged it was finalizing with SGWS.

28.     On June 10, 2021, Bell wrote to Enemigo trying to sell it on the Trinity investment. Bell wrote "I hope you and your investors will seriously consider a near-term $250K investment, and we can utilize proceeds to catch up all [Tequila Enemigo] payables and fund SGWS related growth."

29.     Eager to extract more money out of Enemigo, on June 24, 2021, Bell assured Enemigo that its brand was specifically outlined in the contemplated SGWS contract, and again asked that Enemigo agree to forgive the Verity debt through an investment into Trinity.  Bell wrote "[e]veryone however, agreed and accepted a plan for their specific brand and [Enemigo] is outlined in the SGWS contract. In terms of the capital investment, what I am suggesting is that we net the proceeds against your outstanding payables first."

30.     Flynn and Bell also claimed the master distribution agreement included guaranteed sale minimums and would enable nationwide distribution of Enemigo's tequila.

31.     Flynn and Bell further stated that Enemigo would be a significant priority in Trinity's product line and that SGWS wanted to take an equity stake in Trinity.  As a result, Trinity claimed Enemigo would also benefit from the SGWS distribution deal through an equity stake in Trinity.

32.     Flynn and Bell exchanged multiple emails with Enemigo's principals concerning the SGWS deal in which Flynn and Bell repeatedly assured Enemigo that the deal was being finalized and would directly benefit Enemigo.

33.     In June and July, 2021, Flynn and Bell stated in multiple emails that Trinity was "well positioned to benefit from the SGWS contractual volumes and focus," that Enemigo would be "happy" with the "SGWS contract and Enemigo projections," that Enemigo would be a "significant priority" in the SGWS contract and Trinity product lineup, and that the Enemigo brand was specifically "outlined in the SGWS contract."

34.     On June 28, 2021, Flynn wrote an email to Enemigo stating "the SGWS contract is in the works now, and it includes Tequila Enemigo."  The next day, Bell wrote to Enemigo that "in a nutshell, [Enemigo] will be a significant priority which I think is demonstrated in the narrow focus of the SGWS contract and co-ownership in [Trinity]."

**D.  Enemigo Enters into an Exclusive Supplier Agreement with Trinity Based on Defendants' False Assurances that Trinity was Finalizing a Master Distribution Deal with Southern Glazer's Wine and Spirits**

35.     Enemigo was optimistically cautious about the SGWS deal.  As a prerequisite for signing a new supplier agreement and making an additional investment in Trinity, Enemigo requested, among other things, a signed copy of the SGWS contract and written confirmation from a senior SGWS representative of the authenticity of the SGWS contract.  On June 27, 2021, Enemigo wrote the following email to Trinity:

A Prerequisite will be that funds cannot be transferred and supplier agreement cannot be signed until the completion of the SGWS contract, with inclusion of Tequila Enemigo at 6000 cases is verified and operated on, with the minimums being included in the manager bonuses for this year. A signed copy of the contract must be sent to Enemigo to be 'approved' and a senior representative at SGWS must validate in writing the authenticity of the final signed contract. Enemigo has the right at any time prior to transfer of funds to void the supplier agreement or investment if SGWS contract is not in keeping with the above or any other reasonable expectations. To be clear, If the SGWS deal does not go ahead we will be available to enter in a new agreement based on different terms.

36.     In response, on June 28, 2021, Bell stated that Trinity was "fine with not executing [the new supplier agreement] unless the SGWS agreement is executed," however, Bell did not want to ask "a senior SGWS executive validating in writing the authenticity of the targets or whatever, but [would] discuss it with [Flynn]."

37.     In July 2021, Enemigo and Trinity exchanged multiple emails concerning the status of the purported SGWS master deal.

38.     For example, Enemigo expressed dissatisfaction with a proposed reduction in the guaranteed minimum sales contemplated in the purported SGWS contract.  Bell advised in writing that "[Flynn] will respond with the ex SGWS volumes, but those volumes are from SGWS directly, not Trinity."

39.     A few weeks later, Enemigo asked Trinity when the new supplier agreement would be signed.  On July 21, 2021, Bell advised that "[o]nce SGWS is executed, I will execute[] the documents on the Trinity side."

40.     Notwithstanding, on or about July 27, 2021, Enemigo and Trinity signed the new supplier agreement (the "Trinity Supplier Agreement") based on the assurances given by Defendants and an unsigned draft copy of the SGWS contract.

**E.  Enemigo Agrees to Invest $250,000 in Trinity Based on a Purported Executed Master Distribution Deal with Southern Glazer's Wine and Spirits**

41.     In August 2021, Enemigo requested a status update on when the SGWS contract was scheduled to be finalized and executed.

42.     On August 5, 2021, Bell wrote to Enemigo to advise that "Hill and I are slated to be with SGWS in Miami late next week to add / present two additional brands to the original contract that SGWS has expressed volumetric interest in."

43.     In September, Flynn sent an email to Enemigo stating that he "got the agreement done with SGWS" and acknowledged that the SGWS deal "was something important to [Enemigo's] team."  Flynn went on to write that Enemigo had to keep the SGWS secret and could not share the terms of the deal "with anyone, especially [Trinity's] sales organization" because Trinity could not have its "people brandishing a contract in front of the state managers, which is what they want to do…."

44.     On September 6, 2021, Flynn wrote the following email to one of Enemigo's principals with a copy to Bell:

> Robin,
>
> Hope you're having a good holiday weekend. I got the agreement done with SGWS and I expect a copy sent to me tomorrow. Wet copy to follow. I know this was something important to your team. I will share a copy with you and ask that outside of your investors, you do not share it with anyone, especially our sales organization. We have a lot of work to do to get to our goals and I cannot have our team waving around a contract in front of SGWS personnel. That is reserved for executive level communications. We welcome and appreciate your investment and your partnership. Let's talk this week.
>
> Best regards,
> Hill

45.     A few weeks later, on September 21, 2021, Bell echoed Flynn's comments, stating by email that the SGWS deal had to be kept a secret.  Bell stated as follows:

You have the signed contract and if you need to come see the 'wet' version that Hill has come to the office and see it. I don't know of any other way to confirm that. To be 100% crystal clear this is a private contract that we have with SGWS (and not TE with SGWS to be very clear) and not something to be discussed outside of your investors and Trinity. This should never be advertised or marketed as no brand does that and it reeks of amateur hour.

46.     While Flynn and Bell were insistent upon keeping the SGWS contract secret, on September 13, 2021, Bell forwarded a proposed convertible note to Enemigo which required Enemigo to wire $126,795 and forgive $123,205 in aged payments owed by Verity for a total consideration of $250,000.

47.     Two days later, on September 16, 2021, Flynn and Bell in separate emails sent purported signed copies of the SGWS contract.  Bell sent an email stating "I didn't realize [Flynn] and I are both on the road this week.  See attached for executed SGWS."  In a separate email on the same day, Flynn again emphasized that the SGWS contract had to be kept a secret, even from Trinity's own employees:

Robin,

Attached, and please keep confidential. I cannot have my people brandishing a contract in front of the state managers, which is what they want to do... We will handle at the executive level. See you later today,

Hill

48.     At this time, Bell and Flynn were the Chairman and CEO of Trinity, respectively. The purported SGWS contract and Trinity Supplier Agreement collectively provided for sales totaling approximately $1,200,000 for the first year (2021-2022).

49.     As a follow-up, on September 20, 2021, Enemigo asked for (i) the marketing plan referenced in the alleged SGWS contract; (ii) the consequences for SGWS if the sales minimums were not achieved; and (iii) validation from SGWS that the SGWS contract was valid and enforceable.

10

50.     In response, Bell stated he could provide a "wet" version of the SGWS contract (that never happened), that Flynn "hard vouched" for the Enemigo brand, that SGWS had already cost Bell money, and there would be no SGWS contract unless Enemigo immediately made the $250,000 investment into Trinity through the proposed convertible note.  Bell stated as follows:

> If you guys want to participate or not it's up to you, you have until Friday COB to close and fund, as this has gone on long enough and frankly Hill hard vouched for the brand internally and with SGWS and TE ended up taking a spirits spot in the SGWS contract that otherwise would have gone to one of our owned rums, so it's already cost me money. Our 'special' supplier agreement is predicated upon that investment and will be amended to a standard agreement otherwise.

Based on the above representations, Enemigo agreed to the $250,000 investment and signed a convertible note dated September 27, 2021 issued by Trinity (the "Trinity Note").

51.     Unknown to Enemigo at the time, Defendants were parties to several lawsuits for failing to adhere to their legal obligations.  In 2021, Defendants were sued multiple times for fraud, breach of contract and RICO violations, among other claims.  *See 148 Mad New Owner LLC v. Trinity Beverage Group, LLC, et al.*, Index No. 657170/2021 (N.Y. Sup. Ct.); *Wine Dogs Imports, LLC v. Trinity Beverage Acquisition, LLC, et al.*, Index No. 656365/2021 (N.Y. Sup. Ct.); *Domeneghetti, et al. v. Select Wine & Spirits, LLC, et al.*, Index No. 653347/2021; *Third Leaf Wines LLC v. Verity Wine Partners, et al.*, Index No. 651410/2021.

52.     Of particular note is the *Hobbs v. Verity Wines LLC, et al.*, Case No. 1:21-cv-10597 (JPC) case pending in this Court.  In *Hobbs*, Defendants have been accused of fraud, wire fraud, and RICO violations for engaging in a fraudulent scheme whereby Verity, an entity Bell and Flynn owned and operated, had the plaintiff's wine "repossessed" by a hard money lender who then resold the wine to Trinity at no cost.  The *Hobbs* lawsuit was filed just months after the Trinity Note and Agreement were signed by Enemigo.  Unsurprisingly, none of these lawsuits were disclosed to Enemigo or that Enemigo's initial $500,000 investment in Jureta was worthless

because of, among other things, Defendants' mismanagement and failure to pay their debts. Had they been, Enemigo would have chosen not to conduct business with accused fraudsters.

**F. The Alleged SGWS Deal is Another Trinity Failure with Delays and Minimal Sales; Bell Attempts to Place Blame for Delays and Losses on Flynn**

53.     In the subsequent months following the alleged SGWS distribution rollout, sales were continually delayed. As a result, Enemigo and Trinity began to have monthly sales visits with Trinity representatives without much success.

54.     In March 2022, Trinity informed Enemigo that SGWS had purportedly backed out of the master distribution deal, a deal that was key to Enemigo signing the Trinity Supplier Agreement and investing $250,000 into Trinity.

55.     In June 2022, Bell emailed Trinity's suppliers, including Enemigo, to advise that Trinity has terminated Flynn as its CEO for, among other things, "poor/no communication, silo-ing of information, and frankly lack of results across the board." Bell wrote that Flynn had a "tendency to exaggerate" and that Trinity "did not trust [Flynn]" and grew increasingly skeptical over Flynn's "supposedly 'special' senior relationship with SGWS…." Notwithstanding Flynn's "radioactive" presence and "persona non-grata" status with SGWS, Bell reassured Enemigo that Trinity made "deep inroads into senior SGWS that has indicated that the door is wide open with them, especially on key brands" like Enemigo and that SGWS asked Bell to meet to discuss Trinity and SGWS's "mutual priorities."

**G. Bell Admits the SGWS Deal was a Hoax; Defendants Forged SGWS's Signature on the Master Distribution Deal to Fraudulently Induce Enemigo to Entering into the Trinity Supplier Agreement and Investing $250,000 with Trinity**

56.     As it turns out, there was never a SGWS contract with Trinity. The statements made by Defendants were outright lies.

57.     After over a year of underperformance in which Enemigo received a measly $235,000 in sales from Trinity (approximately $1,000,000 short of the minimum sales set forth in the purported SGWS contract and Trinity Supplier Agreement), Enemigo again asked for confirmation concerning the SGWS contract.

58.     Shockingly, on October 24, 2022, Bell admitted in writing there was never any contract between SGWS and Trinity.  Bell advised Enemigo that the SGWS contract was never signed by SGWS and that Flynn forged SGWS's signature.  Bell wrote as follows:

> After submitting the contract to SGWS for review in September 2022 executive meetings, ***SGWS legal recently let us know that the contract was never formally consummated by SGWS. From discussion with SGWS, it is likely that Hill Flynn forged the signature from SGWS side, I can only assume so as to defend his job at Trinity, by fabricating a contractual relationship where one does not exist nor have we operated under as an organization***. We are evaluating potential legal action against Hill on this subject and several others, but we are operating on a normalized relationship with SGWS.

59.     The SGWS contract was pure fiction that Flynn and Bell wanted to keep secret from SGWS and Trinity's own staff.

60.     On October 27, 2022, Enemigo wrote to Bell and Flynn advising them of Defendants' fraudulent acts and demanded that Trinity immediately return its investments and monies owed in lost sales, along with all existing tequila inventory at all U.S. warehouse locations. Enemigo also demanded that Trinity cease and desist from any and all marketing programs and activities and use of Enemigo's intellectual property, and advised that Trinity was prohibited from fulfilling additional orders of the remaining Enemigo tequila inventory in its possession.

61.     On November 8, 2022, Flynn responded to Enemigo's demand by attempting to place all blame on Bell for Defendants' fraudulent acts.  Flynn wrote, in relevant part: "Bell was the interface with Tequila Enemigo (TE) and it is my belief that he unduly pressured TE and misrepresented the nature of the relationship and invest in Verity Wine Partners and later, Trinity

Wine & Spirits.  It was Bell who orchestrated the Article 9 foreclosure that wiped out TE's investment by TE. It w[a]s Bell who conspired with the senior secured lender, Rosenthal & Rosenthal, to bankrupt Verity Wine Partners, then transfer assets to the new entity Trinity Acquisition.  This acquisition of the assets was an illegal conspiracy put together by Bell and Gordon Lewis of Altman & Co., who was the appointed restructuring officer from the senior secured lender."

## FIRST CLAIM FOR RELIEF
### FRAUD AGAINST ALL DEFENDANTS

62.     Enemigo repeats and alleges the allegations in paragraphs 1 through 61.

63.     Prior to signing the Verity Supplier Agreement, Defendants made multiple false representations of material fact concerning the value of Jureta and its affiliated entities.  Flynn and Bell represented to Enemigo that Jureta was comprised of a valuable investment group that included Verity and focused on wine and spirit distribution throughout the United States.  As a London-based tequila company, Enemigo was eager to make inroads into the United States market and relied on Defendants' representations to expand its brand and presence.  However, within months of making its $500,000 investment into Jureta, Defendants failed to deliver on any of their promises and effectively wiped out Enemigo's investment through the Article 9 foreclosure and rolled up Verity into the new "Trinity" corporate group.

64.     Prior to signing the Trinity Supplier Agreement, Defendants made multiple false representations of material fact concerning the alleged SGWS contract that never existed. Defendants misrepresented to Enemigo that (i) it would be a significant priority in Trinity's product line and that SGWS wanted to take an equity stake in Trinity in 2022; (ii) the alleged SGWS contract included guaranteed sale minimums and would enable nationwide distribution of Enemigo's tequila; (iii) it would benefit from the SGWS distribution deal through an equity stake

in Trinity; (iv) the SGWS deal was being finalized and would directly benefit Enemigo; and (v) the SGWS deal was fully executed and provided Enemigo with an signed copy of the SGWS contract that turned out to be a forgery.

65.    At the time these misrepresentations were made, they were known by Defendants to be false.

66.    Defendants made the misrepresentations with the intent to deceive and defraud Enemigo and to induce Enemigo into signing the Verity and Trinity Supplier Agreements (collectively, the "Supplier Agreements") and investing $500,000 and $250,000 into Jureta and Trinity, respectively.

67.    Enemigo reasonably relied on Defendants' false misrepresentations of material fact and invested money and time into Jureta and Trinity.

68.    As a direct and proximate result of Defendants' actions, Enemigo has suffered and will continue to suffer damages in an amount to be proven at trial, but not less $8,000,000, which represents the investment amount in the Jureta and Trinity Notes ($750,000) (collectively, the "Notes") and lost sales and valuation (approximately $7,300,000) based on agreements that either did not exist or that Trinity knew were impossible to fulfill, together with punitive damages, plus prejudgment interest.

## SECOND CLAIM FOR RELIEF
### BREACH OF CONTRACT AGAINST VERITY

69.    Enemigo repeats and alleges the allegations in paragraphs 1 through 68.

70.    Enemigo and Verity entered into the Verity Supplier Agreement.

71.    Pursuant to § 8 of the Verity Supplier Agreement, Verity was required to purchase 2,500 cases of Enemigo 86 Anejo Cristalino and 500 cases of Enemigo 00 Extra Anejo for a total of $554,000.  Verity only purchased $223,904 worth of tequila, leaving a $330,096 deficiency.

72.     Pursuant to § 15 of the Verity Supplier Agreement, Verity agreed to indemnify Enemigo for, among other things, losses, damages and other expenses, including reasonable attorneys' fees, based upon any breach committed by Verity of the Verity Supplier Agreement.

73.     Enemigo performed its obligations under the Verity Supplier Agreement by producing and supplying tequila to Verity.

74.     Verity breached the Verity Supplier Agreement by failing to purchase the products in the volumes set forth in the Verity Supplier Agreement.  Verity's failure to purchase Enmigo's tequila in the quantities set forth in the Verity Supplier Agreement has had a dramatically negative effect on Enemigo resulting in at least a $2,000,000 loss to the company's valuation.

75.     As a proximate result of Verity's breach of the Verity Supplier Agreement, Enemigo has suffered damages in an amount to be proven at trial, but not less than $2,330,096, plus lost profits and company valuation, attorneys' fees and disbursements as set forth in § 15 of the Verity Supplier Agreement and prejudgment interest.

### THIRD CLAIM FOR RELIEF
### BREACH OF CONTRACT AGAINST TRINITY

76.     Enemigo repeats and alleges the allegations in paragraphs 1 through 75.

77.     Enemigo and Trinity entered into the Trinity Supplier Agreement.

78.     Pursuant to § 8 of the Trinity Supplier Agreement, Trinity was required to purchase 4,850 cases of Enemigo 86 Anejo Cristalino and 1,250 cases of Enemigo 00 Extra Anejo for a total of $1,175,000.  Trinity only purchased $229,224 worth of tequila, leaving a $945,776 deficiency.

79.     Pursuant to § 15 of the Trinity Supplier Agreement, Trinity agreed to indemnify Enemigo for, among other things, losses, damages and other expenses, including reasonable attorneys' fees, based upon any breach committed by Trinity of the Trinity Supplier Agreement.

80.     Enemigo performed its obligations under the Trinity Supplier Agreement by producing and supplying tequila to Trinity.

81.     Trinity breached the Trinity Supplier Agreement by failing to purchase the products in the volumes set forth in the Trinity Supplier Agreement.  Trinity's failure to purchase Enemigo's tequila in the quantities set forth in the Trinity Supplier Agreement has had a dramatically negative effect on Enemigo resulting in at least a $4,000,000 loss to the company's valuation.

82.     As a proximate result of Trinity's breach of the Trinity Supplier Agreement, Enemigo has suffered damages in an amount to be proven at trial, but not less than $4,945,776, plus lost profits and company valuation, attorneys' fees and disbursements as set forth in § 15 of the Trinity Supplier Agreement and prejudgment interest.

**FOURTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT AGAINST ALL DEFENDANTS**

83.     Enemigo repeats and alleges the allegations in paragraphs 1 through 82.

84.     As set forth above, Defendants have been unjustly enriched at Enemigo's expense.

85.     In the event that the Court does not find that a contract existed between Enemigo and any of the Defendants, the Court should find that principles of equity and good conscience do not permit Defendants to retain the $750,000 paid by Plaintiffs, and the rights and benefits received under the Supplier Agreements.

86.     As a direct and proximate result of Defendants' misconduct, Enemigo has been damaged in an amount to be determined at trial, but in no event less than $8,000,000, which represents the investment amount in the Notes ($750,000) and lost sales and valuation (approximately $7,300,000) based on agreements that either did not exist or that Trinity knew were impossible to fulfill, plus prejudgment interest.

### FIFTH CLAIM FOR RELIEF
### DECLATORY JUDGMENT AGAINST JURETA, VERITY, AND TRINITY

87.     Enemigo repeats and alleges the allegations in paragraphs 1 through 86.

88.     There exists an actual controversy between Jureta, Verity, Trinity, and Enemigo that lies within the jurisdiction of this Court pursuant to 28 U.S.C. § 2201.

89.     Defendants made false, misleading and material misrepresentations to Enemigo so that Enemigo would agree to enter into the Supplier Agreements and invest in Jureta and Trinity through issuance of the Notes.

90.     These misrepresentations were made with the understanding and intention that Enemigo would rely on them.

91.     The misrepresentations included (i) that Jureta was a valuable investment group that included Verity and focused on wine and spirit distribution throughout the United States; (ii) that Enemigo would be a significant priority in Trinity's product line and that SGWS wanted to take an equity stake in Trinity in 2022; (iii) the alleged SGWS contract included guaranteed sale minimums and would enable nationwide distribution of Enemigo's tequila; (iv) Enemigo would benefit from the SGWS distribution deal through an equity stake in Trinity; (v) the SGWS deal was being finalized and would directly benefit Enemigo; and (vi) the SGWS deal was fully executed and enforceable.

92.     Enemigo would not have entered into the Supplier Agreements or invested $750,000 through issuance of the Notes had Defendants made accurate representations to Enemigo.

93.     Enemigo is entitled to rescind the Supplier Agreements and Notes because the misrepresentations were material to the acceptance of the Supplier Agreements and Note issuances, and because Enemigo would not have agreed to the Supplier Agreements or Note

issuances had it been aware of the true facts of Jureta's value, Verity's ability to pay its debts, and Trinity's relationship with SGWS.

94.     Accordingly, Enemigo is entitled to a declaratory judgment that the Supplier Agreements and Notes were effectively rescinded by Enemigo's demand letter dated October 27, 2022; or, alternatively, that Enemigo is entitled to rescind the Supplier Agreements and Notes based on the foregoing material misrepresentations and that such rescission will be effective upon service of this Court's judgment; and that Enemigo has no obligations under the Supplier Agreements or Notes because they have been or, upon service of the Court's judgment will have been, rescinded.

### SIXTH CLAIM FOR RELIEF
### CONVERSION AGAINST TRINITY

95.     Enemigo repeats and alleges the allegations in paragraphs 1 through 94.

96.     As a result of Trinity's admitted fraud, Enemigo owns all property interests in the tequila it supplied to Trinity.

97.     Trinity has and continues to exercise unauthorized dominion over Enemigo's tequila in which Enemigo has legal title and a superior right of possession based on Trinity's fraudulent acts.

98.     Trinity has converted the tequila it is holding in warehouses for its own use.

99.     Enemigo has been damaged a direct result of Trinity's improper conduct in an amount to be determined at trial.

### SEVENTH CLAIM FOR RELIEF
### ALTER EGO LIABILITY AGAINST BELL AND FLYNN

100.     Enemigo repeats and alleges the allegations in paragraphs 1 through 99.

101.    The Supplier Agreements and Notes were signed by Bell in exchange for valuable consideration, including $750,000.

102.    At the time the Supplier Agreements and Notes were signed, Bell and Flynn were executives and/or owners of Jureta and Trinity.

103.    Upon information and belief, Bell and Flynn own Jureta and Verity.

104.    Upon information and belief, Bell is the manager and Oracles is the 100% owner of Trinity.  Upon information and belief, Oracles is owned by Bell.

105.    Upon information and belief, Bell and Flynn failed to observe the required corporate formalities as to Jureta, Verity, Oracles, and Trinity, including, *inter alia*, failing to hold meetings, keep corporate records, keep assets separate between corporates, and/or keep separate personal and corporate assets.

106.    Upon information and belief, Jureta, Verity, Oracles, and Trinity lack any accounting, financial review, audit policies, or other mechanisms for ensuring the accuracy and/or legitimacy of their financial records and upon information and belief, Flynn and Bell use this lack of financial accounting to their financial benefit.

107.    Upon information and belief, Flynn and Bell exercise complete dominion and control over Jureta, Verity, Oracles, and Trinity.

108.    Upon information and belief, Jureta, Verity, Oracles, and Trinity are the alter egos of Flynn and Bell.

109.    Upon information and belief, Jureta, Verity, Oracles, and Trinity exist solely as sham corporate vehicles which Flynn and Bell are using in bad faith to shield themselves from liability.

110.    As set forth herein, Enemigo has been harmed by Flynn and Bell's abuse of the corporate form.

111.    Given the unlawful, deceitful, and damaging acts by Flynn and Bell, through Jureta, Verity, Oracles, and Trinity, as set forth herein, Flynn and Bell have no immunity from liability to the extent that they have acted as agents, officers, directors, managers, members, or owners of Jureta, Verity, Oracles, and Trinity.

112.    As a result of the foregoing, Jureta, Verity, Oracles, and Trinity's corporate veils should be pierced and Flynn and Bell should be held personally liable for the acts and obligations of Jureta, Verity, Oracles, and Trinity.

WHEREFORE, Enemigo demands judgment:

A.    On the First Claim for Relief against Defendants in an amount to be proven at trial, but not less than $8,000,000, which represents the investment amount in the Jureta and Trinity Notes ($750,000) (collectively, the "Notes") and lost sales and valuation (approximately $7,300,000) based on agreements that either did not exist or that Trinity knew were impossible to fulfill, together with punitive damages, plus prejudgment interest.

B.    On the Second Claim for Relief against Verity in an amount to be proven at trial, but not less than $2,330,096, plus attorneys' fees and disbursements as set forth in § 15 of the Trinity Supplier Agreement and prejudgment interest

C.    On the Third Claim for Relief against Trinity in an amount to be proven at trial, but not less than $4,945,776, plus attorneys' fees and disbursements as set forth in § 15 of the Trinity Supplier Agreement and prejudgment interest.

D.    On the Fourth Claim for Relief against Defendants in an amount to be determined at trial, but in no event less than $8,000,000, which represents the investment amount in the Notes

($750,000) and lost sales and valuation (approximately $7,300,000) based on agreements that either did not exist or that Trinity knew were impossible to fulfill, plus prejudgment interest.

E.     On the Fifth Claim for Relief against Trinity for a declaratory judgment that the Supplier Agreements and Notes were effectively rescinded by Enemigo's demand letter dated October 27, 2022; or, alternatively, that Enemigo is entitled to rescind the Supplier Agreements and Notes and that such rescission will be effective upon service of this Court's judgment; and that Enemigo has no obligations under the Supplier Agreements or Notes because they have been or, upon service of the Court's judgment will have been, rescinded.

F.     On the Sixth Claim for Relief against Trinity in the amount to be determined at trial, plus prejudgment interest.

G.     On the Seventh Claim for Relief against Bell and Flynn holding them personally liable as alter egos for the acts and obligations of Jureta, Verity, Oracles, and Trinity.

H.     For interest, attorneys' fees, costs and the disbursements of the action and such other relief as the Court deems just.

## REQUEST FOR JURY TRIAL

Enemigo requests a trial by jury of all issues raised that are triable by jury.

Dated:  New York, New York
         November 17, 2022

GOLDENBERG LAW, P.C.

By: */s/ Andrew R. Goldenberg*
Andrew R. Goldenberg
11 Broadway, Suite 615
New York, New York 10004
Telephone: (212) 906-4499

*Attorneys for Plaintiff Enemigo Ltd.*