# EXHIBIT A

Page 1

1

2  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK

3
   22 Civ. 9794(NRB)
4  - - - - - - - - - - - - - - - - - - -x
5  ENEMIGO LTD.,
6                        Plaintiff,
7          -against-
8  TRINITY BEVERAGE GROUP, LLC
   MICHAEL BELL, HILL FLYNN, JURETA
9  CAPITAL PARTNERS LLC, VERITY WINES,
   LLC, ORACLES CAPITAL, INC., ORACLES
10 IMPORTS, LLC d/b/a ORACLES CRAFT
   BRANDS, KATHRYN SELBY,
11 SELBY NEW YORK, INC.
12                       Defendants.
   - - - - - - - - - - - - - - - - - - -x
13          175 Greenwich Street
            55th Floor
14          New York, New York 10007
15          February 13, 2024
            10:01 a.m.
16
17     DEPOSITION of HILL FLYNN, a Defendant
18  in the above-entitled action, held at the
19  above time and place, taken before
20  SAMUEL HITTIN, a Shorthand Reporter and
21  Notary Public of the State of New York,
22  pursuant to the Federal Rules of Civil
23  Procedure, Order and stipulations between
24  Counsel.
25              *      *      *

Page 101

```
 1                    H. FLYNN
 2   company.
 3        Q.    Okay.
 4        A.    And it's my belief that that
 5   happened prior to the merger, but I can't
 6   be certain.
 7        Q.    So your belief is that you held
 8   an equity stake in Verity Wines, LLC
 9   before --
10        A.    No.
11        Q.    -- Verity Wine Partners and
12   Domaine merged into Verity Wine, LLC?
13        A.    I don't know.
14        Q.    After you formed Jureta Capital
15   Partners, did Mike Bell become a member of
16   it?
17        A.    Yes.
18        Q.    Do you recall what his ownership
19   interest was in Jureta?
20        A.    No.
21        Q.    Do you recall what your
22   ownership interest was in Jureta?
23        A.    In the upper teens, percentage
24   wise.
25        Q.    Did you put any money into
```

```
 1                    H. FLYNN
 2   Jureta?
 3        A.    No.
 4        Q.    Did Mike Bell put any money into
 5   Jureta?
 6        A.    I don't know.
 7        Q.    Why would anyone else other than
 8   yourself be a member of Jureta when the
 9   purpose of forming it was for you to have
10   an equity stake in Verity?
11        A.    I was advised that this would be
12   the vehicle for my ownership stake.
13        Q.    Right.
14              But your ownership stake, right,
15   Mr. Flynn?
16        A.    Yes.
17        Q.    Why did Mike Bell then take an
18   ownership stake in Jureta?
19        A.    I think it was at the advice of
20   Gordon Lewis.  He set it up that way.  I
21   don't know.
22        Q.    You don't know?
23        A.    No.
24        Q.    So one day Mr. Bell says, "I own
25   a percentage of Jureta," and you don't
```

Page 111

```
 1                    H. FLYNN
 2   numbers he was presenting to you and the
 3   others?
 4        A.    Yeah, I guess I trusted --
 5   between him and Rosenthal, yeah.
 6        Q.    Okay.  If you can turn to Flynn
 7   802, this is the signature line of the
 8   engagement letter?
 9        A.    Yep.
10        Q.    Do you see here Mike Bell is
11   listed as a partner?
12        A.    Yes.
13        Q.    You considered him -- you
14   considered yourself a partner of Jureta,
15   right?
16        A.    Right.
17        Q.    Okay.  As partners, did you
18   share in the profits of Jureta?
19        A.    There were no profits of Jureta.
20        Q.    Did you share in the losses of
21   Jureta?
22        A.    There were no losses either.
23        Q.    So Jureta never made a profit
24   and never lost any money?
25        A.    No.
```

Page 188

1                         H. FLYNN

2      Q.      And who were those conversations

3   with?

4      A.      Robin Clough.

5      Q.      Anyone else?

6      A.      They had a sales agent in New

7   York, I don't remember his name.

8      Q.      How about Max Davies-Gilbert?

9      A.      I don't think I ever talked to

10  Max.

11     Q.      Okay.  So your contact was Robin

12  Clough of Enemigo?

13     A.      Yes.

14     Q.      And do you recall discussing

15  with Mr. Clough about investing in Jureta

16  Capital?

17     A.      No.

18     Q.      Do you recall Mr. Bell talking

19  to Mr. Clough about investing in Jureta

20  Capital?

21     A.      Yes.

22     Q.      Okay.  Why would Mr. Clough --

23  why would Enemigo invest in Jureta

24  Capital?

25                 MR. TOMARI:  Objection.

Page 189

H. FLYNN

1
2       A.      They wanted a foot in the door
3    in the United States.
4       Q.      But I thought Jureta Capital was
5    the vehicle that you were using to obtain
6    an equity stake in an entity that you're
7    not sure which entity it was, right?
8       A.      It doesn't sound good, but yeah.
9       Q.      Yeah.  It sounds pretty bad,
10   right?
11              MR. TOMARI:  Objection.
12       Q.     You don't even know what entity
13   Jureta was supposed to have an equity
14   stake in; whether it was Domaine, Verity?
15       A.     No.  That's clear to me.
16       Q.     Okay.  Well, your prior
17   testimony didn't seem to be, tell me?
18       A.     It was not Domaine, I can tell
19   you that.
20       Q.     Who was it?
21       A.     I had shares in -- well, yeah.
22   I was using the Jureta name, right.
23       Q.     Right.  But I recall from your
24   prior testimony that you were told by Mike
25   Bell you needed to set up an entity, that

```
                                          Page 222

 1                          H. FLYNN

 2        A.      No, by Verity.

 3        Q.      By Verity, okay.

 4                And did Enemigo loan Jureta half

 5     a million dollars?

 6        A.      I believe so.

 7        Q.      And what forms the basis of that

 8     belief?

 9        A.      I was told that we had more

10     liquidity.

11        Q.      Who told you that?

12        A.      Mike Bell.

13        Q.      And do you know how Jureta or

14     Verity or Trinity used this half a million

15     dollars?

16                MS. GRIMM:   Objections.

17        A.      Programming dollars in the

18     market.  So incentives for salespeople,

19     events, flying Enemigo people around, that

20     sort of thing.

21        Q.      Flying which Enemigo people

22     around?

23        A.      They were working in the market.

24        Q.      Who is "they"?

25        A.      Robin Clough.
```

Page 225

```
 1              H. FLYNN
 2      Q.    So you don't know whether or not
 3  some of the money was used to pay
 4  salaries, for example?
 5      A.    No.
 6      Q.    Would Mike Bell know that?
 7      A.    Gordon Lewis would know that.
 8      Q.    Gordon Lewis would know that.
 9            At the time Enemigo loaned a
10  half a million dollars to Jureta who were
11  Jureta's members?
12      A.    Me and Mike Bell.
13      Q.    Who controlled Jureta at this
14  time?
15      A.    Mike handled everything.
16      Q.    And we don't know at this time
17  if Jureta had a bank account?
18      A.    I don't know.
19      Q.    Do you know if Jureta ever filed
20  tax returns?
21      A.    I don't know.
22      Q.    See on the first page of
23  Plaintiff's 8, Enemigo 2099, it talks
24  about paying Enemigo a six percent per
25  annum interest on the money it lent to
```

```
                                          Page 230
 1                    H. FLYNN
 2   due diligence prior to the merger?
 3        A.    All of those things seemed to
 4   come out of Molly Jobb's office at
 5   CohnReznick.
 6        Q.    Got it.  Is it your
 7   understanding that Enemigo had an equity
 8   stake in Jureta at any point in time?
 9        A.    Say it again.
10              [Whereupon, a portion of the
11        testimony was read back.]
12        A.    I didn't know about it.
13        Q.    So to be clear, you're not aware
14   of Enemigo ever holding an equity position
15   in Jureta?
16        A.    Yes, I was not aware.
17        Q.    Okay.  Got it.
18              Are you aware that in this
19   lawsuit you've taken the position that it
20   did have an equity stake in Jureta?
21              MR. TOMARI:  Objection.
22        A.    It's different from lending.
23              MR. TOMARI:  Objection.
24        Q.    No, Mr. Flynn, it's not.
25              What I'm asking is, you've just
```

Page 261

```
 1                    H. FLYNN
 2      A.    Let me just read through this.
 3            MR. GOLDENBERG:  You know what,
 4      strike that question.
 5      Q.    Were there any agreements
 6  between Jureta Capital and Trinity
 7  involving the note that Jureta issued to
 8  Enemigo?
 9      A.    I don't know.
10      Q.    Do you know what happened to the
11  half a million dollars that Enemigo
12  invested -- or, excuse me -- loaned to
13  Jureta?
14      A.    Well, a portion of it went into
15  programming.
16      Q.    And what happened to the rest of
17  it?
18      A.    I don't know.
19            MR. TOMARI:  Objection, asked
20      and answered.
21      Q.    Mike Bell responds, "As I've
22  explained several times now, JCP owns none
23  of TBG."
24            Is that an accurate statement?
25      A.    I don't know.
```

Page 301

1                    H. FLYNN

2   else.

3        Q.    It's just different words?  Just

4   a d/b/a of Trinity Beverage Group, LLC?

5        A.    Yeah.

6        Q.    Another one, right?  Yeah?

7        A.    Yes.

8        Q.    And up above it is a signature

9   for Gene Sullivan; is that Gene Sullivan's

10  signature?

11       A.    No.

12       Q.    Who signed that?

13       A.    I did.

14       Q.    So you forged Gene Sullivan's

15  signature?

16            MR. TOMARI:  Objection to form.

17       A.    Yes.

18       Q.    Yes.  You did, okay.

19            At the time you did this did you

20  have discussions with Mike Bell about this

21  signature?

22       A.    He said, "You just better get

23  it."

24       Q.    "Or you're fired"?

25       A.    "Or you're fired."

```
                                            Page 336
 1                    H. FLYNN
 2   you see that in the second paragraph?
 3        A.    I do.
 4        Q.    Is that an accurate statement?
 5        A.    I don't think so.
 6        Q.    Who owned and controlled Jureta?
 7        A.    That was between me and Mike.
 8        Q.    So both of you?
 9        A.    Yeah.
10        Q.    And Mike says that he
11   surrendered his minority shares in Jureta
12   in February 2021.
13              Do you recall him surrendering
14   his interest in Jureta?
15        A.    I do.
16        Q.    Did you retain your interest in
17   Jureta at that time?
18        A.    I did.
19        Q.    Is Jureta still an active
20   company?
21        A.    No.
22        Q.    Was it dissolved at some point?
23        A.    I think Kevin Gluntz -- I don't
24   know.
25        Q.    Did Kevin Gluntz oversee
```

Page 339

1                        H. FLYNN
2          Q.    Do you recall telling me there
3     was no forgery?
4          A.    I do.
5          Q.    That wasn't true, right?
6          A.    Right.
7          Q.    Okay.  You also said that it was
8     your belief that, "Bell unduly pressured
9     Tequila Enemigo and misrepresented the
10    nature of the relationship and an invest
11    in Verity Wine Properties."
12               Can you explain that to me?
13    What was the misrepresentation?
14               MR. NIRENBERG:  Just note my
15          objection.
16          A.    Well, I stand by the statement
17    that he unduly pressured Tequila Enemigo,
18    it was just never a good fit.
19    Representing the nature the relationship,
20    the brand never had buy-in from the team,
21    I guess that's what I meant at the time.
22          Q.    The buy-in from what team?
23          A.    From the sales organization.
24          Q.    Of which entity?
25          A.    Of -- at that time that was

```
 1                    H. FLYNN
 2    Verity Wines LLC.
 3        Q.    And then later there was no
 4    buy-in from Trinity?
 5        A.    That I don't know.
 6        Q.    And the pressure that was being
 7    applied to Enemigo was for the purpose of
 8    having Enemigo invest in these entities,
 9    correct?
10        A.    Correct.
11              MR. NIRENBERG:  Just note my
12        objection.
13        Q.    And you write, "It was Bell who
14    orchestrated the Article 9 foreclosure
15    that wiped out Enemigo's initial
16    investment by Enemigo."
17              Can you explain that to me?  How
18    did Bell orchestrate the Article 9
19    foreclosure?
20              MR. NIRENBERG:  Note my
21        objection.
22        A.    Can I take a two-minute break?
23        Q.    After you answer my question.
24        A.    Okay.  He relinquished his
25    shares in Verity and he, to the best of my
```